IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br><br>vs.<br><br>CHRISTOPHER NEIL MARTIN,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS<br><br><br><br>Case No. 2:09-CR-747 TS |

This matter is before the Court on Defendant's Motion to Suppress.  Defendant seeks the

suppression of all evidence obtained as a result of an alleged seizure of Defendant and a search of

a home and backpack.  The Court held an evidentiary hearing on this matter on November 10,

2009.  This matter became fully briefed on January 6, 2010, and is now ripe for decision.[1]  For

the reasons discussed below, the Court will grant the Motion in part and deny it in part.

## I.  FINDINGS OF FACT

On or about August 19, 2009, Defendant was living at a home in Midvale, Utah (the

"Midvale House") with his roommate, Darrell Smart, and another individual.  He had been living

---

[1]After this date, both parties filed briefs without seeking permission of the Court.
Thought these briefs were not authorized, the Court has reviewed and considered them.

at the Midvale House for approximately one week.  On that date, Defendant was informed by Mr. Smart that they could no longer live at the Midvale House.

At that time, another friend of Defendant's, Jamie Lynn Sheridan, told Defendant and Mr. Smart that they could live with her and another friend, Jennifer Swift, at a home located on 1000 East (the "10th East House").  Mr. Smart transported Defendant's possessions to the 10th East House and Defendant was driven there by Mr. Smart and a third person.

Upon arriving at the 10th East House, Defendant introduced himself to the others at the home and established that it was okay for him to stay there.  Defendant testified that be believed that Ms. Sheridan had the authority to let him stay at the 10th East House and that he would "never stepped foot in there" if he believed otherwise.[2]

Defendant was assigned a bedroom in the back of the house.  Defendant moved his possessions to the back bedroom.  The parties have entered into a Joint Stipulation, wherein they agree that Defendant would testify that he: (1) believed that the bedroom at the 10th East House was his private domain; and (2) believed he had the right to exclude others from the bedroom and that others would not enter said bedroom without express or implied consent.[3]

Defendant testified that the utilities were on in the home and that there were normal household items—such as dishes, a television, a mattress, food, and other toiletries—in the home.  Defendant also testified that the other residents had a key to the house.  Additionally, Defendant testified that there were no indications, such as paperwork or "No Trespassing" signs, which indicated that he could not stay at the home.

---

[2]Docket No. 24, at 14:12.

[3]Docket No. 27.

The owner of the 10th East House was Ramiz Ibisevic.  The 10th East House was divided into a duplex.  At the time of the incident in question, Defendant and the others were staying in Unit B of the duplex.  Prior to that time, Unit B was occupied by a Mr. Baker and Ms. Hall.  Ms. Swift is Ms. Hall's daughter.  Unit A, at all relevant times, was occupied by Zamira Devis.

At some point, Mr. Ibisevic defaulted on his mortgage.  On April 6, 2009, both units of the 10th East House received a Notice of Trustee's Sale.  In May 2009, a Notice to Quit was taped to the door of both units.  The Notice to Quit advised the occupants to vacate the 10th East property.  There is no evidence that Defendant was made aware of either the Notice of Trustee's Sale or Notice to Quit.  As indicated, Defendant testified that there were no indications, such as paperwork or "No Trespassing" signs, which indicated that he could not stay at the home.

Mr. Baker entered into an agreement that he would vacate the property by August 4, 2009, and he and Ms. Hall apparently did vacate the property by the time of this incident.

Ms. Devis obtained a new residence in May and began moving her belongings from the 10th East House to her new residence.  At the time of this incident, August 21, 2009, she had not completely removed all of her belongings from Unit A of the 10th East House.

On August 21, 2009, Ms. Devis received a text message from a neighbor indicating that a group of men were coming out of the back door of Unit A.  Ms Devis arrived at the 10th East House with her ex-husband Steve.  Ms. Devis and Steve saw a man, not Defendant, come out of the back door of Unit A carrying laundry.  The man had apparently been using Ms. Devis' washing machine.  The man then went to Unit B.

Ms. Devis called the police.  Deputy Gamble was dispatched to the 10th East House on a burglary call.  When he arrived on the scene, Deputy Gamble spoke with Ms. Devis and Steve.

3

Ms. Devis told Deputy Gamble that there was a male in her part of the residence doing laundry. Ms. Devis also showed Deputy Gamble some documents relating to the eviction proceedings.

Deputy Gamble then attempted to make contact with those individuals inside Unit B. Deputy Gamble knocked on the door, but no one answered.  While he could not see into Unit B he could hear movement inside the unit, which led him to believe that there were people in the Unit.  At that point, Deputy Gamble returned to Ms. Devis to obtain information for his report.

Deputy Gamble then heard yelling from the other side of the house.  Deputy Gamble went to find out what the yelling was about and discovered Steve with another man, who was identified by Steve as one of the individuals that was inside the house.

Deputy Gamble spoke with this individual, identified as Darrell Smart.  Mr. Smart advised Deputy Gamble that the people who had moved out of Unit B had told him that he could stay there "until the bank came in and kicked them out and changed the locks on the house."[4]

After speaking with Mr. Smart, Deputy Gamble, Ms. Devis, and Steve, walked through Unit A.  Ms. Devis reported that her television was missing.  The television was later found in Unit B, but was not discovered until after Deputy Gamble's interaction with Defendant.  Ms. Devis also reported that some of her mail was missing.  They then went to the garage where Ms. Devis' mail and other mail from the area was discovered.

While Deputy Gamble was looking through the mail, he heard Steve yell that another male had come out of Unit B.  This individual was later identified as the Defendant.  Deputy Gamble asked this individual for his name and birth date.  The name given by Defendant was "Gavin Hunter."  Deputy Gamble ran this information through dispatch, which did not come up

---

[4]Docket No. 24, at 61:4-5.

with any results.  Deputy Gamble then asked Defendant for some identification.  Defendant indicated that it was in the house.  Deputy Gamble then followed Defendant into the house and into the back bedroom.  There is no evidence that Deputy Gamble sought or received permission to enter the house or the bedroom.

In the bedroom, Defendant pulled out two bags from the bedroom closet, a plastic bag and a camouflage backpack.  Shortly after retrieving the bags, Defendant jumped out of the bedroom window and fled, leaving the bags in the bedroom.  Deputy Gamble testified that Defendant was not under arrest when he fled.

Deputy Gamble then seized the bags, testifying that they were abandoned property and evidence in a criminal investigation.  Later, Deputy Gamble clarified that the bags were seized because they were abandoned.  Deputy Gamble did not obtain a search warrant to look in the bags, but did later search the bags when they were inventoried.  A firearm was found in the camouflage backpack.

The next day, August 22, 2009, Deputy Gamble was again called to the 10th East House. Deputy Gamble spoke with Ms. Swift.  Ms. Swift indicated that she was the daughter of the previous tenant, Ms. Hall.  Ms. Swift had a key to the unit.  She indicated that she, along with Ms. Sheridan, Mr. Smart, and another individual were living at the house.  Deputy Gamble testified Ms. Swift indicated that she knew she was not supposed to be there as they had been told to move out.  This statement, however, was not contained in Deputy Gamble's report.

## II. DISCUSSION

### A.   STANDING

Defendant argues that he has standing to object to the entry into the 10th East House and the search of his bags.  The Court considers two factors in determining whether a Defendant has

standing: (1) whether the Defendant has a subjective expectation of privacy in the area searched; and (2) whether society is prepared to recognize that expectation as reasonable.[5]

The first issue is whether Defendant has the authority to challenge Deputy Gamble's entry into the home.  First, it is clear that Defendant had a subjective expectation of privacy in the home or, at the very least, the back bedroom in which he stayed.  Defendant was invited to live at the home and confirmed that it was okay for him to stay there.  Defendant was assigned a bedroom in the home and moved his personal possessions to the bedroom.  Additionally, the parties have submitted a Joint Stipulation which provides that Defendant would testify that he believed that: his bedroom in the 10th East House was his private domain, he had the right to exclude others from the bedroom, and others would not enter the bedroom without his express or implied consent.[6]  From these things, the Court finds that Defendant had a subjective expectation of privacy in at least the bedroom he occupied in the 10th East House.

The next issue is whether society is prepared to recognize that expectation as reasonable.  The government argues that Defendant was essentially a trespasser or squatter at the 10th East House and had no expectation of privacy.[7]  The government argues that the home was in foreclosure proceedings and that no one had the right to be there.  The government also emphasizes the fact that Defendant had no ownership interest in the home, did not have a lease agreement, did not pay rent, and did not ever agree to pay rent.

---

[5]*United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990).

[6]Docket No. 27.

[7]*See Zimmerman v. Bishop Estate*, 25 F.3d 784, 787-88 (9th Cir. 1994); *United States v. Dodds*, 946 F.2d 726, 729 (10th Cir. 1991); *United States v. Ruckman*, 806 F.2d 1471, 1473-74 (10th Cir. 1986); *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 10-12 (1st Cir. 1975).

The Court can find no case directly on point, but the *Zimmerman* case cited by both parties provides the closest analogy.  In that case, Zimmerman was arrested for trespass while a house guest of the Kanes.[8]  The Kanes were squatters in a shack on property owned by the Bishop Estate of Hawaii.[9]  The Kanes had sought and were denied permission to live on the property.[10]  Additionally, the Kanes were warned by letter and in person, on numerous occasions, that they were trespassing by residing on the property and that they had to vacate.[11]  On one such occasion Zimmerman himself was warned that he was trespassing.[12]  When he failed to vacate, Zimmerman was arrested.[13]  Zimmerman brought an action under 42 U.S.C. § 1983 alleging a violation of his Fourth Amendment rights.[14]  The Ninth Circuit rejected Zimmerman's claim, holding that the Kanes were squatters and that Zimmerman, as their guest, had no greater right than the Kanes.[15]

There are material differences between this case and *Zimmerman*.  In *Zimmerman*, both the Kanes and Zimmerman himself had been notified that they were trespassers.  There is no evidence here that Defendant was ever told that he could not be on the property.  Indeed, all evidence points to the contrary.  Defendant testified that he was told he could live at the home by

---

[8]*Zimmerman*, 25 F.3d at 786.

[9]*Id*.

[10]*Id*.

[11]*Id*.

[12]*Id*. at 786-87.

[13]*Id*. at 787.

[14]*Id*.

[15]*Id*. at 787-88.

Ms. Sheridan, whom he believed had the authority to extend such an invitation, and that Defendant established that it was okay for him to stay there.  Further, Defendant testified that the utilities were on in the home, that there were normal household items in the home, that the other residents had a key to the house, and that there were no indications, such as paperwork or "No Trespassing" signs, which indicated that he could not stay at the home.

Additionally, in *Zimmerman*, there was "no dispute of material fact regarding the ownership of the property or whether the [owners] acquiesced in the presence of the Kanes."[16] Here, the ownership of the home at the time of the incident is unclear.  While the home was in foreclosure, the evidence does not show that the bank had taken possession of the home.  And while Deputy Gamble testified that Ms. Swift stated she knew that they were not supposed to be in the home, he also testified that Mr. Smart stated that he was told they could stay in the home until the bank changed the locks and kicked him out.  Thus, the ownership of the property and the authority of those staying in Unit B to be present are in dispute.

Based on the above, the Court finds that this case is distinguishable from the types of trespasser/squatter cases cited by the government.  Rather, the Court finds that Defendant's status is much more akin to that of an overnight guest than of a trespasser or squatter.  The Supreme Court, in *Minnesota v. Olson*,[17] recognized that a person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."[18]  As set forth above, Defendant was invited to stay at the home by one

---

[16]*Id*. at 787.

[17]495 U.S. 81 (1990).

[18]*Id*. at 96-97.

with the apparent authority to do so, he was given a room to stay in, and he moved his personal possessions into that room.  As to that room, the parties have stipulated that Defendant would testify that he believed that: his bedroom was his private domain, he had the right to exclude others from the bedroom, and others would not enter the bedroom without his express or implied consent.  Based on these things, the Court finds that Defendant had a reasonable expectation of privacy and has the ability to challenge Deputy Gamble's entry into the home and the bedroom he occupied, in particular.

Defendant's standing to challenge the search of the camouflage backpack is closely related to the issue of abandonment and will be discussed in more detail below.

B.      INITIAL ENCOUNTER

Defendant argues that the initial encounter between himself and Deputy Gamble was unlawful.  The government argues that the encounter was consensual in nature.

As set forth above, Deputy Gamble first encountered Defendant when he heard Ms. Devis' ex-husband yelling.  Deputy Gamble asked Defendant for his name and birth date. Defendant gave the name of "Gavin Hunter."  Deputy Gamble then ran this information through dispatch, which did not come up with anything.  At this point, Deputy Gamble asked Defendant for identification.

The Supreme Court has delineated three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be

supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.[19]

Consensual encounters between police and citizens are not considered "seizures" within the meaning of the Fourth Amendment and consequently do not require any suspicion of criminal wrongdoing.[20]  The following factors are relevant in determining whether an encounter is consensual: (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.[21]

Here, it appears that Deputy Gamble was the only officer present when he first encountered Defendant.  Deputy Gamble did not brandish his weapon, did not physically touch Defendant, and there is no evidence of aggressive language or tone.  Further, there is no evidence of a prolonged retention of Defendant's personal effects nor is there any indication that Deputy Gamble asked Defendant to accompany him to the police station.  Finally, the initial encounter occurred outside the 10th East House and other individuals, such as Ms. Devis and the others staying in Unit B, were in the general vicinity.  Based on the totality of the circumstances, the

---

[19]*United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007).

[20]*United States v. Drayton*, 536 U.S. 194, 200-01 (2002) (stating that "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means").

[21]*United States v. Rogers*, 556 F.3d 1130, 1137-38 (10th Cir. 2009).

Court finds that the initial encounter between Defendant and Deputy Gamble was consensual in nature.

Even if the initial encounter was not consensual, the Court finds that any seizure that may have occurred was based on reasonable suspicion of criminal activity.  In *Terry v. Ohio*,[22] the Supreme Court held a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[23]  "A *Terry* stop, considering the totality of the circumstances, requires 'a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'"[24]  Under *Terry*, an investigative detention is reasonable if it is: (1) justified at its inception; and (2) reasonably related in scope to the circumstances which justified the interference in the first place.[25]

> The Supreme Court has also stated several useful principles regarding the government's ability to obtain a citizen's identity during a *Terry* stop.  The Court has made clear, for example, that a police officer may ask an individual to volunteer his identity without implicating the Fourth Amendment.  If, however, the request for identification comes after an officer stops an individual for investigative purposes, the Fourth Amendment requires the initial stop to have been based on reasonable suspicion.  If the officer possesses reasonable suspicion, thereby justifying the initial stop, it is well established that [the] officer may ask a suspect to identify himself in the course of a *Terry* stop. . . .[26]

---

[22]392 U.S. 1 (1968).

[23]*Id*. at 21.

[24]*United States v. Villagrana-Flores*, 467 F.3d 1269, 1275 (10th Cir. 2006) (quoting *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir.1996)).

[25]*United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009).

[26]*Villagrana-Flores*, 467 F.3d at 1275 (quotation marks and citations omitted).

Here, Deputy Gamble's initial detention of Defendant, if one did occur, was based on reasonable suspicion of criminal activity.  Deputy Gamble had been dispatched to the 10th East House on a burglary call.  In speaking with Ms. Devis, Deputy Gamble learned that certain individuals had been in her portion of the duplex using her washing machine.  Ms. Devis also reported that certain items were missing from her Unit.  Deputy Gamble was also shown certain documents related to the foreclosure proceeding, which could have indicated that the individuals were trespassing.  Based on the information available to him, there was reasonable suspicion that Defendant was trespassing or that he may have been involved in the unlawful entry or burglary of Unit A.  From this, Deputy Gamble had reasonable and articulable suspicion that Defendant was engaged in criminal activity.  Because the initial stop was justified, Deputy Gamble was permitted to ask Defendant to identify himself or obtain additional information.[27]  As the Supreme Court has explained:

> Asking questions is an essential part of police investigations.  In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. "[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."[28]

Based on the totality of the circumstances, the Court finds that Deputy Gamble had reasonable articulable suspicion that Defendant was engaged in criminal activity.  As a result, the officer was permitted to ask Defendant to identify himself and provide identification.  That request was reasonably related in scope to the circumstances which justified the interference in the first place.  Therefore, the Court finds that any detention that may have occurred in the initial

---

[27]*See id.* at 1276.

[28]*Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 185 (2004) (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)).

interaction between Defendant and Deputy Gamble was permissible under the Fourth

Amendment.

C.      ENTRY INTO THE HOME

After he was unable to successfully verify the information given to him by Defendant,

Deputy Gamble asked Defendant for some identification.  Defendant indicated that it was in the

house.  Deputy Gamble then followed Defendant into the house and into the back bedroom.

There is no evidence that Deputy Gamble either sought or obtained permission to enter the home

or bedroom.  Defendant argues that this entry into the home and bedroom was unlawful.  The

government argues that the entry was lawful on the grounds of officer safety.  The government

further argues that Deputy Gamble's entry was a permissible protective sweep.

"The Fourth Amendment generally prohibits the warrantless entry of a person's home,

whether to make an arrest or to search for specific objects."[29]  But there are exceptions to this

general rule.[30]

The government argues that the entry into the 10th East Home was warranted because of

exigent circumstances, namely officer safety.  The Tenth Circuit has "applied the 'exigent

circumstances' exception to warrantless entry when the circumstances posed a significant risk to

the safety of a police officer or a third party."[31]  To justify a search based on exigent

circumstances the Tenth Circuit requires: "(1) the officers have an objectively reasonable basis to

believe there is an immediate need to protect the lives or safety of themselves or others, and (2)

---

[29]*Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

[30]*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). One such exception is consent, but that exception has not been advanced by the government.

[31]*United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006).

the manner and scope of the search is reasonable . . . ."[32]  The government bears the burden of establishing exigency.[33]  Here, there is no evidence to support a finding of exigency.

The government also argues that the entry was permissible as a protective sweep. However, the Tenth Circuit has stated that a protective sweep of a residence to ensure officer safety may take place only incident to an arrest.[34]  Here, no arrest had been made when Deputy Gamble entered the 10th East House.  Therefore, this argument cannot support the entry.

Based on the above, the Court finds that Deputy Gamble's entry into the 10th East House and the back bedroom was unlawful in these circumstances.

D.      SEIZURE AND SEARCH OF THE BACKPACK

After Defendant and Deputy Gamble entered the 10th East House, Defendant pulled out two bags from the bedroom closet, a plastic bag and a camouflage backpack.  After removing the bags, Defendant jumped out of the bedroom window and fled, leaving the bags in the bedroom. Deputy Gamble then seized the bags and later searched them.  Defendant argues that the seizure and the search of the camouflage backpack was unlawful.  The government argues that Defendant abandoned the backpack.[35]

"A warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment."[36]  "The test for abandonment is whether an individual has retained any

---

[32]*Id.* at 718.

[33]*United States v. Rhiger*, 315 F.3d 1283, 1288 (10th Cir. 2003).

[34]*United States v. Torres-Castro*, 470 F.3d 992, 996-97 (10th Cir. 2006).

[35]The government does not argue that the search of the backpack was authorized as an inventory search.

[36]*United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993).

reasonable expectation of privacy in the object.  Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search or seizure of property which had been abandoned."[37]  The burden is on the government to establish abandonment by a preponderance of the evidence.[38]  The test for abandonment subsumes both a subjective and objective component.[39]

The Tenth Circuit has historically found abandonment in situations "where the defendant either (1) explicitly disclaimed an interest in the object, or (2) unambiguously engaged in physical conduct that constituted abandonment."[40]  Examples of the first category include *United States v. Ojeda-Ramos*,[41] where the defendant expressly disclaimed an interest in a suitcase[42] and *United States v. Burbage*,[43] where the defendant affirmatively denied owning a backpack.[44] Examples of the second category include *United States v. Austin*,[45] where the defendant left his luggage with a stranger at an airport.[46]  Another example of the second category can be found in

---

[37]*United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997).

[38]*United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006).

[39]*Garzon*, 119 F.3d at 1449.

[40]*Id*. at 1452.

[41]455 F.3d 1178 (10th Cir. 2006).

[42]*Id*. at 1187.

[43]365 F.3d 1174 (10th Cir. 2004).

[44]*Id*. at 1178-79.

[45]66 F.3d 1115 (10th Cir. 1995).

[46]*Id*. at 1119.

*United States v. Flynn*,[47] where a large sack of methamphetamine was thrown from Defendant's car.[48]

   While no Tenth Circuit case is directly on point, the Court finds *United States v. Garzon* to be helpful.  The defendant was traveling by bus from Los Angeles to Chicago, and then on to Cleveland.[49]  The bus was scheduled to stop in Denver.[50]  Before reaching Denver, the driver informed passengers that they would be permitted to leave their carry-on luggage on the bus during the layover.[51]  In Denver, the bus was boarded by DEA agents.[52]  One of the agents told the passengers that the carry-on luggage would need to be removed.[53]

   After all the passengers left the bus, an agent observed two backpacks in the overhead luggage compartment.[54]  The agent removed the backpacks from the bus and asked two passengers, neither of which were the defendant, if the bags belonged to them.[55]  These two passengers disclaimed ownership of the bag and the agent made no further attempt to identify the owner.[56]

---

[47]309 F.3d 736 (10th Cir. 2002).

[48]*Id*. at 737.

[49]*Garzon*, 119 F.3d at 1448.

[50]*Id.*

[51]*Id.*

[52]*Id.*

[53]*Id.*

[54]*Id.*

[55]*Id.*

[56]*Id.*

16

A narcotics detection dog alerted on one of the bags.[57]  One of the agents then searched both backpacks, though he had not obtained a warrant, and found two bricks of cocaine.[58]  The agents then looked for defendant.[59]  The officers did not ask defendant whether he had left any luggage on the bus nor did they ask if the bags belonged to him.[60]

The district court ruled that defendant had abandoned the bags.[61]  On appeal, the Tenth Circuit reversed.  The court began by emphasizing that the government did not argue, and the court below did not find, that the officer's order for all passengers to leave the bus with their belongings was a lawful order.[62]  The court stated that "[t]he order to [the defendant] to remove his personal belongings and the subsequent warrantless search of his backpacks was in violation of [the defendant's] Fourth Amendment rights and the fruits of the search must be suppressed unless [the defendant] abandoned his backpacks."[63]

Next, the court emphasized that the defendant

> did nothing to manifest objectively an intent to abandon his backpacks that were left on the bus. [The Defendant] never once denied ownership of those backpacks. Indeed, he did not even stand silent when asked if anyone claimed them because no such inquiry was ever directed at [the defendant] or, so far as this record shows, was any such inquiry ever uttered within [the defendant's] hearing. Further, he never objectively evidenced an abandonment intent by clear and

---

[57]*Id.*

[58]*Id.*

[59]*Id.*

[60]*Id.* at 1148-49.

[61]*Id.* at 1149.

[62]*Id.* at 1450.

[63]*Id.*

> unequivocal physical acts, such as throwing them away, giving them to strangers, leaving them unguarded on public property or the like. To the contrary, he left them in a secure overhead internal luggage rack just as he was told he could by the bus driver.[64]

The court then examined whether the defendant's failure to comply with the officer's unlawful order to remove his belongings from the bus constituted abandonment. The court found that it did not, concluding that "[a] defendant cannot be deemed to be acting unreasonably and objectively to have abandoned his or her property merely be refusing to comply with an unlawful order."[65]

The court then emphasized the difference between the defendant's actions and the actions in other cases where the court had found abandonment.

> [The Defendant] never verbally disclaimed an interest in his backpacks; he never discarded the backpacks on to public property; and he did not entrust the backpacks to complete strangers. Rather, he left the backpacks where the bus company told him he had a legal right to leave them during the layover in Denver.[66]

While there are a number of differences between the case before the Court and *Garzon*, there are also a number of similarities. First here, as in *Garzon*, there is a Fourth Amendment violation prior to the search. In *Garzon*, that violation took the form of an unlawful order to vacate the bus, while here it took the form of an unlawful entry into the 10th East House. Second, Defendant here, as the defendant in *Garzon*, never disclaimed an interest in the camouflage backpack; did not discard the backpack on public property; nor did he entrust the

---

[64]*Id*.

[65]*Id*. at 1451.

[66]*Id*. at 1452.

18

backpack to a stranger.  Finally, Defendant, like the defendant in *Garzon*, left the backpack where he had the apparent legal right to leave it.

Based on the evidence before it, the Court finds that Defendant retained a reasonable expectation of privacy in the camouflage backpack after he fled the 10th East House.  There is no evidence to suggest that Defendant made a verbal disclaimer of abandonment.  Defendant did not state that the backpack did not belong to him nor did he claim that it belonged to anyone else.  Indeed, when Deputy Gamble sought identification from Defendant, Defendant retrieved the camouflage backpack, a move which would indicate possession rather than abandonment.  Further, Defendant's physical actions of fleeing the 10th East House do not unambiguously constitute abandonment.  This is not a situation where Defendant threw the backpack onto public property where anyone could find it.  Rather, Defendant left the backpack in a room in which he, as discussed above, had a reasonable expectation of privacy.  Based on these things, the Court finds that Defendant did not abandon the camouflage backpack.  Therefore, the Court finds that the seizure and search of the backpack were in violation of the Fourth Amendment and the contents of the backpack must be suppressed.

### III.  CONCLUSION

Based upon the foregoing, it is therefore

ORDERED that Defendant's Motion to Suppress (Docket No. 15) is GRANTED IN PART AND DENIED IN PART as set forth above.  It is further

ORDERED that the time from the filing of the Motion to Suppress through the new trial date of February 8, 2010, is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(D) and (H).

DATED   January 14, 2010.

BY THE COURT:

_____
TED STEWART
United States District Judge